IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **01-cv-00739-JLK**

**ECHOSTAR SATELLITE CORPORATION, a Colorado corporation; ECHOSTAR COMMUNICATIONS CORPORATION, a Nevada corporation; and ECHOSPHERE CORPORATION, a Colorado corporation,**

Plaintiffs,

v.

**ULTRAVIEW SATELLITE, INC., a Texas corporation;**
**WAYNE J. WICKLINE, an individual and d/b/a PRIME SATELLITE SERVICE CO.,**

Defendants.

_____

## MEMORANDUM OPINION AND ORDER
_____

Kane, J.

This diversity action is before me on the motion for summary judgment by Plaintiffs

EchoStar Satellite Corporation, EchoStar Communications Corp. and EchoSphere Corporation

against Defendants Ultraview Satellite, Inc. and Wayne J. Wickline.  The parties' dispute arises

from a short-lived business relationship between them and former Defendants Alvin Bush and

Darrell Hayes doing business as Prime Satellite.  Having carefully considered the parties' briefs,

statements of disputed and undisputed facts and the evidence supporting their asserted facts, I

deny Plaintiffs' motion.

## <u>Background</u>

Before stating the relevant disputed and undisputed facts, I must comment on the factual

presentation made by Plaintiffs.  Plaintiffs's statement of allegedly undisputed facts consists of

148 numbered paragraphs consuming 23 pages of text.  Upon close examination, I determined

that a number of the allegedly undisputed facts asserted were not supported by the evidence

cited.  In other instances the cited evidence, usually excerpts from Plaintiffs' deposition of

Defendant Wickline, was so incomplete and without context that it was impossible to determine

whether it supported the fact asserted.[1]  In addition, Plaintiffs' statement of facts often omitted

dates and other identifiers which resulted in an incomplete and/or misleading account of the

events and transactions underlying the parties' dispute.  As a result, as described in detail below,

Plaintiffs have failed to present evidence that, even if undisputed, would establish a prima facie

case against Wickline or Ultraview on the asserted claims.

Plaintiffs also objected to Defendants' production and reliance on an affidavit by

Wickline to oppose Plaintiffs' motion, urging that the affidavit be stricken because it was self-

serving, contrary to Wickline's deposition testimony, without foundation and based on

inadmissible hearsay.  These objections, repeated in nearly identical fashion for more than 50 of

the 63 paragraphs of Wickline's affidavit, are baseless.  In particular, while Mr. Wickline's

account of the parties' dealings may differ from the one Plaintiffs assembled from sometimes

mismatched snippets of his deposition testimony, it is not inconsistent with the material elements

of his deposition testimony, as best I can discern that testimony from the present record.

Plaintiffs' complaints regarding foundation and inadmissible hearsay are also without merit on

the present record.  Accordingly, I find no basis for striking or otherwise disregarding

Mr. Wickline's affidavit, and have relied on it where relevant and appropriate in the following

factual summary.

---

[1]     Plaintiffs' decision to reproduce only the specific lines from Wickline's
deposition it relied upon, rather than providing copies of the page or pages from the deposition
transcript that encompassed the cited lines, was particularly problematic.  This practice removed
all context for the cited testimony, which often made it impossible to determine if the testimony
supported, or was even relevant to, the allegedly undisputed fact for which it was cited.

With this background, the following facts are undisputed unless otherwise stated:

Plaintiffs EchoStar Satellite Corporation and EchoSphere Corporation, both Colorado corporations, and EchoStar Communications Corporation, a Nevada corporation, (collectively "EchoStar") are in the business of providing digital direct broadcast satellite services through the "DISH Network."  All three companies are headquartered in Denver, Colorado.

EchoStar utilizes a national network of independent retailers to promote and solicit customers for its DISH Network programming.  Retailers join this network by entering into an EchoStar Retailer Agreement that authorizes them, on a non-exclusive basis, to market, promote and solicit orders for DISH Network programming.  Participating retailers solicit new subscribers to EchoStar's DISH Network, purchase the necessary satellite receiver and related equipment from EchoStar or another authorized manufacturer, install the equipment at the subscriber's home or business and then receive commissions and other incentives pursuant to the Retailer Agreement for each new subscriber that activates and maintains its DISH Network subscription.  These incentives can include a "bounty" or "reward" for persuading customers of EchoStar competitors to switch to EchoStar's DISH Network programming.  The Retailer Agreement also provides for commission payments to be reversed, via "chargebacks" to the retailer, if a subscriber it recruited cancels his or her subscription.

Defendant Ultraview Satellite, Inc. is a Texas corporation formed in 1996.  From 1996 into 1999 it was a successful dealer for PrimeStar, DirecTV and other EchoStar competitors.  Its president and sole shareholder and director is Defendant Wayne Wickline.

In early 1999, EchoStar representatives approached Ultraview about entering into a "bounty" agreement with EchoStar to market and convert existing Primestar customers to

EchoStar's DISH Network programming.  Ultraview did not sign the "bounty" agreement but, on March 19, 1999, entered into EchoStar's standard, non-exclusive Retailer Agreement to market, purchase, sell and install EchoStar satellite systems in return for commissions.  Ultraview ultimately did not, however, purchase any satellite equipment, perform any installations or recruit any new DISH Network subscribers under this Retailer Agreement.

At the time Ultraview entered into the March 1999 Retailer Agreement with EchoStar it was awaiting word on a new retailer agreement with DirecTV.  It was also under contract to Primestar, but Primestar was no longer able to provide its dealers with equipment.  EchoStar alleges Ultraview's agreement with Primestar prohibited it from converting Primestar customers to another programming service, but there is no evidence in the record that this was the case. EchoStar also alleges Primestar officially went out of business on March 15, 1999, but the record is unclear on this point.

On April 9, 1999, Ultraview entered into an Independent Contractor Agreement (ICA) with former Defendant Alvin Bush.[2]  Bush had participated in the satellite system business since 1996 under the name Prime Satellite (Prime).  Ultraview's Wickline first met Bush in 1996. Although EchoStar suggests Ultraview and Bush/Prime had business dealings from this date forward, it has not produced evidence to support any business relationship between them before 1999.

---

[2]     Ultraview also entered into an ICA on this date with former Defendant Darrell Hayes, who worked with Bush under the Prime Satellite moniker.  EchoStar voluntarily dismissed Hayes without prejudice after it was unable to locate him for service.  *See* Pls.' Notice of Rule 41(a)(1) Voluntary Dismissal (Doc. 29).

In the ICA, Bush agreed to perform marketing and sales assignments from Ultraview as an independent contractor.  His compensation under the ICA was a commission for each assignment completed.  These assignments and related commissions are set out in a series of separately executed addendums to the April 9 agreement, and include sales of satellite and home security systems, prepaid legal services and unsecured Visa credit cards.

On April 15, 1999, Bush, as "owner" of Prime Satellite, executed a Retailer Agreement between Prime and EchoStar.  *See* Exs. to Pls.' Mot. for Summ. J. (Doc. 58), Pls.' Ex. 56 [hereinafter "Prime-EchoStar Retailer Agreement"] at 11.  He also signed EchoStar's bounty agreement to pursue Primestar customers.

Two weeks later, on April 29, Bush and Ultraview agreed to an addendum to their ICA addressing Bush/Prime's sale of EchoStar's DISH Network programming, including to current Primestar customers.  In addition to setting the commission due Bush for each such sale, the addendum required Bush to pay Ultraview certain monies he was to receive pursuant to the Prime-EchoStar Retailer Agreement to repay $100,000 in loans Bush had received from Ultraview from February 15 through April 21, 1999.

In another addendum executed on April 29, Bush granted Ultraview management authority over Prime's checking account, including exclusive authority to write checks, withdraw funds and make deposits in this account.  Bush also agreed, on behalf of Prime, not to take any actions with respect to the Prime checking account or the Prime-EchoStar Retailer Agreement that would change the Bush-Ultraview agreement to Ultraview's detriment.  According to Ultraview's Wickline, these provisions were intended to provide Ultraview with security that its $100,000 in loans to Bush would be repaid.  The parties' agreement did not,

5

however, require that Bush cancel his access to the Prime account and, in fact, he remained a signatory on this bank account after he signed the April 29 addendum.

Prime, through Bush and his associates, began marketing EchoStar systems and DISH Network programming immediately after the April 29 addendums were added to the Bush-Ultraview ICA.  All of the subscribers Prime successfully solicited over the next three and half months were former Primestar customers.

As provided in the Prime-EchoStar Retailer Agreement, EchoStar deposited the commissions, bounties and other monies Prime earned through these efforts directly into Prime's checking account.  It also inventoried equipment ordered in connection with Prime's marketing and sales to Prime's EchoStar retailer account.

From the end of April until early July 1999, Prime sent the DISH Network orders it solicited to Ultraview.  Ultraview then contacted EchoStar to order satellite equipment on Prime's behalf through Prime's retailer account and paid for the equipment by check or credit card.  Ultraview also arranged for installation of the equipment through independent contractors and ensured that the subscriber's service was activated.  Wickline testified that Prime placed some equipment orders and performed some installations itself towards the end of the Ultraview-Prime relationship.  For some period during this brief relationship, Ultraview also kept Prime's customer files at its office and had Prime's satellite equipment delivered directly to Ultraview's warehouse.

Pursuant to the Ultraview-Bush ICA, Ultraview would write itself a check from Prime's checking account to recover the cost of the equipment purchases or other expenses it paid on Prime's behalf.  It would also use this method to pay itself the other monies, including loan

payments, Bush owed it pursuant to the ICA.  These payments from Prime to Ultraview frequently occurred soon after EchoStar transferred commission or other payments to Prime's checking account for sales and installations made pursuant to the Prime-EchoStar Retailer Agreement.

On May 5, 1999, early in the Ultraview-Prime-EchoStar relationship, Ultraview discovered that EchoStar had mistakenly inventoried satellite receivers ordered pursuant to the Prime-EchoStar Retailer Agreement to the dormant Ultraview retailer account associated with the March 1999 Ultraview-EchoStar Retailer Agreement.  As a result, EchoStar transferred $27,504.20 in commissions due to Prime for subscriptions relating to this equipment into Ultraview's bank account instead of Prime's.  Upon discovering the error, Ultraview's Wickline contacted EchoStar and requested that it rescan the satellite receivers into Prime's retailer account.  EchoStar complied, and then requested that Ultraview return the $27,504.20 in commissions EchoStar had mistakenly paid it.  Ultraview agreed to do so but first requested a guarantee that EchoStar would then properly post this amount to Prime's bank account (where it would be available to pay Prime's obligations to Ultraview).  Ultraview heard nothing more about this issue until it received a demand letter from EchoStar in late July that referenced this amount.[3]

Beginning in mid-June, 1999, Bush began writing small checks on the Prime checking account in violation of the ICA.  Ultraview did not learn of these unauthorized transactions for several weeks.

---

[3]     It is not clear from the record whether EchoStar ever paid Prime the $27,504.20 in commissions it was due for installation of this equipment.

In early July, Bush informed Ultraview that he no longer wanted it to perform installations of EchoStar satellite systems sold by Prime. As a result, on July 5, he and Ultraview entered into two new addenda to their ICA that allowed Prime to acquire the EchoStar equipment Ultraview had received and paid for on Prime's behalf and to lease some of Ultraview's vans, if needed. In addition, the parties agreed that Ultraview would continue to receive a portion of various payments Prime was to receive from EchoStar pursuant to the Prime-EchoStar Retailer Agreement in order to repay the $100,000 Ultraview had loaned Bush/Prime through April 21, 1999. The addenda also set a payment schedule for an additional $29,500 Ultraview had loaned and/or advanced to Bush/Prime after April 21.

Pursuant to their revised agreement, Bush borrowed one of Ultraview's cargo vans and picked up from Ultraview's warehouse at least three loads of EchoStar satellite equipment Ultraview had purchased on Prime's behalf. Bush also retrieved the Prime customer records that were in Ultraview's possession.

Just before Ultraview and Bush amended the ICA as just described, EchoStar notified an Ultraview employee that it had mistakenly allowed Ultraview to order more satellite equipment for Prime on credit than was permitted. As a result, EchoStar requested that Ultraview pay EchoStar $129,250 by check for this equipment. Ultraview agreed and asked an EchoStar representative to stop by its office the next day, July 2, to pick the check.[4]

---

[4]     The record does not reveal whether the EchoStar equipment that Bush picked up in early July is the same equipment that Ultraview was to pay for by this check.

That evening, to save time the following morning, an Ultraview employee printed two checks to EchoStar for $64,625 each, or a total of $129,250.[5]  The next morning, July 2, Maryann Wickline, who handled Ultraview's bank account, checked the balance on the Ultraview account and made several deposits to it sufficient to cover the checks to EchoStar.  An EchoStar representative picked up the checks later in the day.

One of the deposits to the Ultraview account on July 2 was a $56,050 check from Prime to Ultraview, which Ultraview had written pursuant to the ICA upon confirming there were sufficient funds in the Prime account to cover this amount.  However, in the interim between Ultraview's July 2 deposit and July 8, when EchoStar attempted to deposit the two Ultraview checks it had received, the unauthorized transactions by Alvin Bush on the Prime account, all of them still unknown to Ultraview, caused the $56,050 check from Prime to Ultraview to be returned for insufficient funds.  This reduced the balance in Ultraview's account by the amount of the bounced Prime check.  As a result, there were not sufficient funds in Ultraview's account to cover the second $64,625 check, Check #22004, it had written to EchoStar when EchoStar presented the check for payment on July 8.

On July 8, Prime's bank separately informed Bush that the July 2 Prime check to Ultraview for $56,050 had been returned to the Prime account because there were not, by a small amount, sufficient funds in that account to cover it.  As a result of this returned check, nearly $56,000 were then present in the Prime account.  In violation of the ICA, Bush immediately removed $55,000 from the Prime account, leaving a balance of less than $1,000.

---

[5]     The employee printed two checks instead of one for the total amount because Ultraview's office computer could not print a check for $100,000 or more.

On July 9, Ultraview's Wickline discovered that Bush had essentially cleaned out Prime's checking account in violation of the ICA.  He also learned of Bush's previous unauthorized withdrawals from the Prime account on this date.  After Bush and his associates did not return his phone calls, Wickline drove to Prime's office to confront Bush.  He discovered Prime's 3,000 square foot office completely vacated with the Ultraview van Bush had borrowed parked outside without the key.

As Wickline was dealing with these discoveries, a shipment of EchoStar satellite equipment Ultraview had ordered on Prime's behalf arrived at Ultraview's warehouse.  Wickline called EchoStar, explained the situation and informed the EchoStar representative that Ultraview would not be doing any further installations on Prime's behalf.  He testified that the EchoStar representative, Shanna Welch, agreed that Ultraview could refuse delivery of the satellite equipment and that the $16,634.00 charge on Wickline's credit card for purchase of this equipment would be reversed.  Welch also reportedly agreed that Ultraview could return an additional 46 satellite receivers of Prime's that it had in its warehouse for a $9,454.60 credit to Wickline's credit card.  As a result, Ultraview refused delivery of the July 9 shipment and returned the 46 Prime satellite receivers to EchoStar.

During his July 9 conversations with EchoStar, Wickline also inquired into the possibility of Ultraview acting under its March 1999 Retailer Agreement with EchoStar to begin marketing and selling EchoStar's DISH Network.  Upon learning that the March agreement had been cancelled, the parties executed a new EchoStar Retailer Agreement on July 20, 1999.[6]

---

[6]     Ultraview and EchoStar dispute which party cancelled their March 1999 Retailer Agreement, but this dispute is not material.

Just before they executed the new Retailer Agreement, EchoStar sent Ultraview a letter demanding payment for Ultraview Check #22004, the check for $64,625.00 for satellite equipment ordered on Prime's behalf that had bounced, and $27,504.20, the amount EchoStar had mistakenly deposited into Ultraview's bank account for satellite receivers that were later correctly inventoried into Prime's EchoStar account.  Ultraview objected, stating it was not responsible for outstanding balances owed by Prime as the dealer of record.  Apparently as a result of this dispute, EchoStar initially did not permit Ultraview to purchase satellite equipment on the retailer account it established for Ultraview pursuant to the July 1999 Ultraview-EchoStar Retailer Agreement.

EchoStar also refused to provide Ultraview with credit for the Prime equipment Ultraview had returned to EchoStar.  According to Wickline, EchoStar told him that it intended to keep these amounts to offset debts Prime owed to EchoStar.  Wickline responded by contacting his bank to dispute the $16,634.00 credit card charge for the July 9 equipment delivery Ultraview had refused and the $9,454.60 charge for the Prime satellite equipment Ultraview had returned.  He ultimately succeeded in having the $16,634.00 charge reversed.

Ultraview also took steps to recover the monies due it from Bush.  It filed suit against him individually and d/b/a Prime Satellite and against Bush associate Darrell Hayes in Texas state court for the $55,000 Bush had withdrawn from Prime's account in violation of the ICA and for the balance due on the various loans Ultraview had made to Bush.  Ultraview ultimately succeeded in obtaining a default judgment against Bush and Hayes for actual damages of $99,970.00, plus attorney fees and court costs.  To date, however, Ultraview has been unable to locate Bush or Hayes or to collect on this judgment.

11

In December 1999, Wickline wrote his bank to dispute another set of credit card charges to EchoStar, all posted in late September and early October 1999.  Based on the letter, it appears that, notwithstanding their continuing dispute regarding Ultraview's responsibility for debts arising under Prime's Retailer Agreement, EchoStar at some point reopened Ultraview's retailer account and allowed it to purchase satellite equipment for installation.  According to Wickline, however, EchoStar misdesignated this equipment to Prime's retailer account, and then refused to correct the error or pay Ultraview commissions it earned for the sale and installation of this equipment as a result of the debt remaining under the Prime-EchoStar Retailer Agreement.  In the course of disputing these credit card charges, Wickline provided his bank with information about EchoStar's contractual relationship with its dealers under the Retailer Agreement.

Based on these events EchoStar asserts eight claims against Ultraview and Wickline, seeking to hold them liable on various theories for more than $375,000 allegedly owed by Prime to EchoStar under Prime's Retailer Agreement and for other alleged wrong-doing.  EchoStar has moved for summary judgment on these claims.

### Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In applying this standard, I view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  EchoStar, as the moving party here, has the initial burden of showing the absence of a genuine issue of material fact and that it

is entitled to judgment as a matter of law.  *Id.*  If EchoStar carries this burden, then the burden

shifts to Wickline and Ultravic to "set forth specific facts showing there is a genuine issue for

trial." Fed. R. Civ. P. 56(e); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A

genuine issue of material fact exists if a rational juror could decide the disputed allegations in the

non-movant's favor based on the evidence presented and the disputed fact might affect the

outcome of the suit under the governing law.  *See Schwarz v. Bhd. of Maint. of Way Employees*,

264 F.3d 1181, 1183 (10th Cir. 2001).

### Discussion

Although EchoStar states that it seeks summary judgment on each of the eight claims it

has asserted against Defendants Wickline and Ultraview, it does not address one of these claims,

for intentional interference with existing business contacts, in its motion.  Accordingly, summary

judgment is denied as to this claim.  The merits of EchoStar's motion as to its other claims are

assessed below.

I.      Alter Ego Claim

One of the claims asserted by EchoStar in its complaint is that Wickline is the alter ego

for the "corporate Defendants."  Complaint (Doc. 1), ¶¶ 95-99.  In its motion for summary

judgment, EchoStar expands this concept to argue that under the undisputed evidence not only is

Wickline the alter ego of Ultraview, but also that both he and Ultraview are alter egos of Prime

Satellite.   These contentions are central to most of EchoStar's other claims against Wickline and

Ultraview.

An initial question of law disputed by the parties is whether Texas or Colorado law sets

the standard for determining whether Wickline and Ultraview are alter egos of each other and of

Prime.  As a federal court sitting in diversity in Colorado, I apply Colorado choice of law principles to decide this question.  *See Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003).  The Colorado courts generally follow the choice of law principles set forth in the Restatement (Second) of Conflicts of Laws.  *See Wood Bros. Homes v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979).  The Restatement provides that the law of the state of incorporation sets the standards for piercing a corporation's veil.  *See* Restatement (Second) of Conflicts § 307 (1971); *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1575 n.18 (10th Cir. 1990).  It is undisputed that both Ultraview and Prime are Texas entitites.  Texas law, therefore, will be applied to EchoStar's attempt to pierce Ultraview's and Prime's corporate veil to hold Wickline liable for Ultraview and Prime's obligations, and Ultraview liable for Prime's obligations.[7]

Under Texas law, as elsewhere, "[t]he corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations."  *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986).  An individual, or another corporation, can nonetheless be found liable for these obligations under an alter ego theory "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice."  *Id.* at 272.  The rationale for this result is that if shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it as far as necessary to protect corporate creditors.  *Id.* at 271.

---

[7]        EchoStar contends Colorado law governs the alter ego question as a result of the parties' choice of Colorado law to govern their contractual relations.  Even if this were true, any differences between Colorado and Texas law on the alter ego question are immaterial under the facts of this case.  As a result, I would reach the same result described above even if Colorado law governed the alter ego determination.

Under Texas law, an alter ego relationship is "shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.* Whether an individual or corporation is an alter ego for another corporation is a question of fact ordinarily decided by the jury. *Id.* at 277.

A.      Wickline as the Alter Ego of Ultraview

EchoStar argues that Wickline is the alter ego of Ultraview, as a matter of law, based on the following undisputed facts: (1) Wickline is the sole shareholder and director of Ultraview; (2) Wickline is Ultraview's president and, as such, is responsible for the company's day-to-day operations, including the hiring and firing of employees, ordering and maintaining inventory, entering into contracts and overseeing satellite installations; (3) Ultraview paid Wickline a salary for the services he performed as president but did not have a set compensation for him; (4) Wickline had discretion to set his own salary and testified he did not "pay attention to how much money he was paying himself," Pls.' Mot. for Summ. J. (Doc. 57) at 31; (5) Wickline received his salary by transfer, initiated by him or his wife, from Ultraview's bank account to the Wicklines' personal account; and (6) Ultraview's annual corporate minutes were identical in most respects from year-to-year.

This evidence, viewed from any perspective, is not sufficient to carry EchoStar's burden of demonstrating such unity between Ultraview and Wickline "that the separateness of the

corporation has ceased.'"[8]  *See Castleberry*, 721 S.W.2d at 272.  To the contrary, most of the

stated facts are unexceptional.  That Wickline is Ultraview's sole shareholder and thus "could

manage its affairs as he saw fit," for example, does not deprive Ultraview of its separate

corporate existence.  *Commonwealth of Mass. v. Davis*, 168 S.W.2d 216, 224 (Tex. 1943); *see*

*Aztec Mgmt. & Inv. Co. v. McKenzie*, 709 S.W.2d 237, 239 (Tex. App. 1986).  Nor can it be said

that Wickline commingled personal and corporate funds simply because his salary was paid by

transfer from Ultraview's corporate account to his family's personal account.[9]  As for

Ultraview's allegedly identical annual corporate minutes, to the extent this could even be

considered disregard of corporate formalities, the Texas legislature has eliminated this factor as a

basis for establishing alter ego liability.  *See Western Horizontal Drilling, Inc. v. Jonnett Energy*

*Corp.*, 11 F.3d 65, 68 (5th Cir. 1994).

EchoStar further alleges that Wickline is Ultraview's alter ego because Ultraview had

"few of the usual incidents of a going concern, had no business a part [sic] from [Wickline] and

his use of the asset, and [Wickline] regarded the asset as his own all times" and "operat[ed] the

---

[8]     Because EchoStar has failed to make a prima facie showing of this element of an alter ego claim, I need not consider the additional element, which is whether it would be unjust to hold only the corporation liable.  *See Castleberry*, 721 S.W.2d at 272.

[9]     The majority of EchoStar's evidence of alleged commingling of Ultraview and Wickline's personal funds actually relates to Ultraview's payments from its corporate account to EchoStar on behalf of Bush/Prime, *see* Pls.' Mot. for Summ. J. at 32 (citing EchoStar's Statements of Undisputed Facts #63-64), Ultraview's payments to itself from Bush/Prime's account in accordance with the Ultraview-Bush ICA, *see id.*, and loans by Ultraview to Bush/Prime and others, *see id.* (citing EchoStar's Statements of Undisputed Facts #87-88).  None of these alleged facts are relevant to Wickline's alleged status as Ultraview's alter ego. EchoStar's additional basis for alleging that Wickline commingled his personal funds with Ultraview funds, that Wickline allegedly made personal loans to Bush at some point, *see id.* (citing EchoStar Statement of Undisputed Facts #89-90, 148), is both unsupported in the record and of no apparent relevance to the Wickline-Ultraview alter ego question.

business as a mere pretext in order to protect his individual interests." Pls.' Mot. for Summ. J. (Doc. 57) at 33. These conclusory allegations are not supported by the evidence cited and merely parrot conclusions stated by other courts that found an alter ego relationship under very different facts. *See Shamrock Oil & Gas Co. v. J.E. Ethridge*, 159 F. Supp. 693, 697-98 (D. Colo. 1958) (cited in Pls.' Mot. for Summ. J. (Doc. 57) at 28-33). As a result, EchoStar has not carried its initial burden on summary judgment of demonstrating, based on a properly supported statement of undisputed facts, that Ultraview was the alter ego of Wickline.[10]

B.      Wickline and/or Ultraview as the Alter Ego of Prime Satellite

EchoStar also seeks to hold Wickline and Ultraview liable for obligations under the Prime-EchoStar Retailer Agreement under an alter ego theory. The undisputed summary judgment evidence, EchoStar asserts, establishes that Prime and Ultraview were not separate companies and, in fact, that Prime was no more than a "dummy corporation created to protect and advance the personal interests" of Wickline. Pls.' Mot. for Summ. J. at 33.

The most fundamental problem with this contention is that there is no evidence in the summary judgment record that Prime is a corporation. In fact, EchoStar admitted earlier in this proceeding that Prime is not a separate entity at all but is simply the name Alvin Bush uses in

---

[10]      If EchoStar had presented evidence sufficient to make a prima facie case that Ultraview was Wickline's alter ego, Wickline presented more than sufficient evidence to raise a genuine issue of fact regarding this question, including evidence that Ultraview was properly incorporated in 1996 and maintained corporate formalities, that it was an ongoing concern from 1996 through 1999, and that Ultraview and Wickline maintained separate bank accounts and filed separate tax returns. In addition, there is no evidence that Ultraview was undercapitalized or that it was used for Wickline's personal purposes.

conducting his satellite sales and marketing business.  *See* Pls.' Req. to Vacate Hr'g (Doc. 21).[11]

That Prime is a corporation is, by definition, a prerequisite to using an alter ego analysis to hold

an individual or another corporation liable for Prime's obligations or wrongdoing.  *See, e.g.*,

*Castleberry*, 721 S.W.2d at 272 (alter ego is a basis "for disregarding the corporate fiction where

a corporation is organized and operated as a mere tool or business conduit of another").

EchoStar cannot therefore, as a matter of law, prevail on its claim that Wickline or Ultraview is

the alter ego of Prime, *i.e.*, Bush, or succeed in its effort to hold Wickline or Ultraview liable on

this basis for any obligation or wrongdoing by Bush d/b/a Prime Satellite.[12]

II.     Other Claims

        EchoStar asserts breach of contract and other substantive claims against Defendants

Wickline and Ultraview.  Again, the initial question presented is what law governs these claims,

which is determined under Colorado choice of law principles.  *See Century 21*, 315 F.3d at 1281.

 Colorado permits contracting parties to choose a particular body of law to govern their

contractual relations unless there is no reasonable basis for their choice or the law chosen would

be contrary to the fundamental policy of a state whose law would otherwise govern.  *Id.*  In this

---

[11]     Specifically, EchoStar reported "Plaintiffs have further investigated the status of Prime Satellite and Prime Satellite Service Company and determined that they are, in fact, DBAs of Defendant Alvin Bush.  Therefore, Plaintiffs withdraw their request for entry of default against Prime Satellite and Prime Satellite Service Company."  Pls.' Request to Vacate Hearing (Doc. 21) at 3, ¶ 7.

[12]     I also note that even if Prime were a corporation subject to an alter ego analysis, EchoStar's evidence that Prime was the mere alter ego of Wickline and/or Ultraview is weak and far from undisputed.  In fact, it appears from the undisputed record that Bush/Prime was a separately operating business for several years before the four month period giving rise to this litigation and, viewing the evidence in the light most favorable to Defendants, that Bush/Prime had an arms-length business relationship with Ultraview defined by the April 1999 ICA that Bush/Prime ultimately breached to Ultraview's detriment.

case, the EchoStar Retailer Agreements with Ultraview and Prime provide "the relationship between the parties including all disputes and claims, whether arising in contract, tort, or under statute" shall be governed by Colorado law. *See, e.g.*, EchoStar Retailer Agreement, § 14.4.1. Given EchoStar's presence in Colorado, there was a reasonable basis for this choice and neither party contends any other state's law should apply to EchoStar's breach of contract and related claims. Accordingly, I will employ Colorado law in considering these claims.

> A.      Breach of Contract

In order to establish its entitlement to summary judgment against Wickline or Ultraview on its breach of contract claim, EchoStar must show that, under the undisputed facts: (1) Ultraview and/or Wickline entered into a contract with EchoStar; (2) Ultraview and/or Wickline failed to perform an obligation required by the contract; (3) EchoStar performed its part of the contract or was justified in not performing; and (4) the failure to perform by Ultraview and/or Wickline caused damages to EchoStar. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); CJI-Civ. 30:1 (2008).

EchoStar has not presented evidence meeting this standard as to either Defendant. As to Wickline, there is no evidence that he, as an individual, entered into any contract with EchoStar. As a result, EchoStar cannot establish that it is entitled to judgment against Wickline as a matter of law.

EchoStar's statement of the allegedly undisputed facts supporting its breach of contract claim against Ultraview is muddled to say the least. As best I can determine, EchoStar alleges Ultraview breached three separate agreements as follows:

<u>March 1999 Ultraview-EchoStar Retailer Agreement</u>

EchoStar alleges Ultraview's failure to pay it $27,504.20, the amount EchoStar mistakenly deposited in Ultraview's bank account on May 5, 1999, was a breach of Ultraview's March 1999 Retailer Agreement with EchoStar.[13]  The contract provision cited by EchoStar, however, only applies when Ultraview, as the Retailer, has ordered EchoStar products pursuant to the Retailer Agreement.  Although EchoStar asserts in its brief and Statement of Undisputed Facts that Ultraview ordered EchoStar equipment pursuant to the March 1999 Ultraview Retailer Agreement, it presents no evidence that this occurred, or that either party performed in any way under this agreement.[14]  Based on the current record, it is also not clear whether the March 1999 Ultraview-EchoStar Retailer Agreement was still in existence on the date of the alleged breach or whether it had been cancelled by then.  On either basis, EchoStar has failed to present evidence sufficient to make a prima facie case that Ultraview breached its March 1999 Retailer Agreement with EchoStar and therefore cannot demonstrate it is entitled to judgment as a matter of law for breach of this agreement.

---

[13]      Although EchoStar does not make this distinction in its argument, it is clear that this allegation must pertain to the March 1999 Ultraview Retailer Agreement, as the event occurred more than two months before the parties entered into the July 20, 1999 Retailer Agreement.  To the extent EchoStar asserts Ultraview breached the April 1999 Prime-EchoStar Retailer Agreement by its lack of action, this assertion is rejected as a matter of law for the same reasons stated below for Ultraview's other claimed breaches of Prime's Retailer Agreement.

[14]      The evidence EchoStar cites in support of this allegedly undisputed fact reports only that Ultraview signed a second Retailer Agreement with EchoStar in July 1999, and provides no information about any Ultraview equipment orders placed pursuant to either Retailer Agreement.  In fact, Wickline testified in his affidavit that Ultraview never purchased any equipment or performed any installations pursuant to its March 1999 Retailer Agreement with EchoStar.  *See* Defs.' Resp. to Pls.' Mot. for Summ. J. (Doc. 62), Ex. A-1 [hereinafter "Wickline Aff."], ¶ 12.

<u>July 1999 Ultraview-EchoStar Retailer Agreement</u>

EchoStar asserts in its brief that Ultraview disclosed proprietary EchoStar information to its bank in the course of disputing satellite equipment charges that Ultraview had paid to EchoStar.  Pls.' Mot. for Summ. J. (Doc. 57) at 41.  This disclosure, EchoStar argues, breached the confidentiality provisions of Section 13 of its standard Retailer Agreement.  This Section, as relevant here, states the Retailer will maintain the terms and conditions of the Agreement in confidence except in limited circumstances.  Complaint (Doc. 1), Ex. A [hereinafter "July 1999 Ultraview-EchoStar Agreement"], § 13.1.  The Agreement provides that if its confidentiality provisions are breached, then EchoStar has the right to terminate all commission payments due to the Retailer, in addition to any other remedies available to it.  *Id.*, § 5.6.2(b).

The only evidence EchoStar presents of any potential breach of this provision is a letter Wickline wrote to his bank on December 30, 1999 disputing credit card charges made to EchoStar for satellite equipment ordered, received and installed in September 1999, presumably pursuant to Ultraview's July 1999 EchoStar Retailer Agreement.  *See* Pls.' Mot. for Summ. J. at 9, 41 (relying on Pls.' Ex. 97, a Dec. 30, 1999 letter from Wickline to NationsBank).  In the letter, Wickline disputes his obligation to pay $3,225.00 for this equipment on the ground that EchoStar had refused to pay Ultraview the commissions it was owed for this equipment and had instead applied these commissions to the debt Prime owed EchoStar under Prime's April 1999 Retailer Agreement.  *See* Exs. to Pls.' Mot. for Summ. J. (Doc. 58), Pls.' Ex. 97.

EchoStar has not presented evidence that the information Wickline provided the bank in explaining the basis for disputing the credit card charges was "proprietary information" as

alleged.[15]  Even if Wickline's action could be deemed a breach of Ultraview's Retailer

Agreement without this proof, EchoStar has not presented evidence it was damaged by

Wickline's disclosure of the allegedly confidential information to his bank.  As a result,

EchoStar has not presented evidence sufficient to establish a prima facie case of breach of

contract based on the July 1999 Ultraview-EchoStar Retailer Agreement.  *Western Distributing*

*Co.*, 841 P.2d at 1058 (proof of damages an element of breach of contract claim).

April 1999 Prime-EchoStar Retailer Agreement

Finally, EchoStar asserts Ultraview breached the April 1999 Prime-EchoStar Retailer

Agreement by (1) refusing to accept the July 9 shipment of EchoStar satellite equipment

Ultraview had previously ordered on Prime's behalf under Prime's EchoStar retailer account, *see*

Pls.' Mot. for Summ. J. at 40; (2) disputing its obligation to pay EchoStar for satellite equipment

the corporation had ordered on Prime's behalf and then returned to EchoStar after Bush cleaned

out the Prime bank account, *see id.*; (3) writing a bad check in early July 1999 for $64,625 for

EchoStar equipment ordered on Prime's behalf, *id.*; and (4) failing to pay EchoStar for

"chargebacks" due under the Prime-EchoStar Retailer Agreement as a result of subscriber

deactivations, *see id.* at 41-42.

Even assuming all of these alleged circumstances could constitute a breach of the Prime-

EchoStar Retailer Agreement, which is doubtful, it is undisputed that Ultraview is not a party to

---

[15]      Wickline testified that this allegedly confidential information is available to any prospective EchoStar dealer.  *See* Wickline Aff., ¶ 60.  I also note that much of the allegedly confidential information is set out by EchoStar in its complaint and summary judgment motion and attachments.  The letter in which Wickline disclosed the allegedly proprietary information is, in fact, one of EchoStar's summary judgment exhibits.  EchoStar did not seek to file any of these materials under seal, and all are currently part of the public record in this action.

that agreement.  As a result, EchoStar has failed to establish a prima facie case against Ultraview for breach of this, or any other, EchoStar Retailer Agreement.

B.      Open Account/Account Stated

EchoStar seeks summary judgment against Wickline and Ultraview for failure to make payment on an account.  The vendor identified on the account for which they seek recovery is Prime Satellite.  *See* Exs. to Pls.' Mot. for Summ. J. (Doc. 58), Ex. 179.  As a result, EchoStar has failed to present evidence establishing a prima facie case against Wickline and Ultraview for this claim.  *See Gifford-Hill & Co. v. Wagner*, 509 P.2d 322, 323 (Colo. Ct. App. 1973) (book account evincing sale and delivery of merchandise to defendant in the usual course of business establishes prima facie case in claim on book account).  Having failed to present evidence establishing a prima facie case, EchoStar is not entitled to summary judgment on this claim against these Defendants.

C.      Damages for Nonpayment of Check #22004

EchoStar asserts Ultraview and/or Wickline is liable to it for three times the $64,625 face value of Check #22004, as well as attorney fees and costs, pursuant to Colo. Rev. Stat. § 13-21-109.  This statute provides "any person who obtains money, merchandise, property, or other thing of value, or who makes any payment of any obligation" by making a check that is not paid upon its presentment is liable for three times the face value of the check if payment is not made within 15 days of the payee's notice of nonpayment in accordance with the statute.  Colo. Rev. Stat. § 13-21-109(1)(c), (2)(a).  The maker of the check is not liable for treble damages, however, if it can establish that the account on which the check was drawn had sufficient funds to cover the check at the time the check was made.  *Id.* § 13-21-09(2)(b)(I).

23

It is undisputed that Check #22004 was the second of two checks for $64,625 Ultraview wrote on Prime's behalf to pay for equipment ordered pursuant to Prime's Retailer Agreement with Echostar.  It is also undisputed that an Ultraview employee printed the checks on an office computer on the evening of July 1, and that on July 2 Maryann Wickline made deposits into the Ultraview account sufficient to cover both of the $64,625 checks before they were delivered to EchoStar.  The checks were signed by Wayne Wickline, reportedly by stamped signature.

It is undisputed that the returned check, #22004, was made by Ultraview on an Ultraview account, and not by Wickline in his individual capacity.  Accordingly, as a matter of law, there is no basis for holding Wickline individually liable for this check under the Colorado statute. *See Kunz v. Cycles West, Inc.*, 969 P.2d 781, 784 (Colo. Ct. App. 1998) (corporate officer who signs check issued on corporate account is not liable for check or damages under Colo. Rev. Stat. § 13-21-109).

I also deny EchoStar's request for summary judgment against Ultraview on this claim. First, there is no evidence in the record that EchoStar provided Ultraview with any written notice of nonpayment of this check, let alone written notice meeting the strict requirements of the Colorado statute.[16]  *See Group, Inc. v. Spanier*, 940 P.2d 1120, 1122 (Colo. Ct. App. 1997)

---

[16]     The statute requires that written notice regarding the unpaid check include the following information:  (a) the date the check was issued; (b) the name of the bank, depository, person, firm, or corporation on which it was drawn; (c) the name of the payee; (d) the face amount; (e) a statement of the total amount due, which must be itemized and not exceed the amount permitted by the statute; (f) a statement that the maker has fifteen days from the date notice is given to make payment in full of the total amount due; and (g) a statement that if the total amount due is not paid within fifteen days after the date notice was given the maker may be liable for three times the face value of the check, as well as court costs and attorney fees.  Colo. Rev. Stat. § 13-21-109(4).  The statute further requires that the notice be personally served or mailed by certified mail, return receipt requested or by regular mail with an affidavit of mailing sworn and retained by the sender.  *Id.* § 13-21-109(3).

24

(failure to strictly comply with statutory notice requirements precludes collection of treble damages).  As a result, EchoStar has failed to present evidence that, even if undisputed, would entitle it to summary judgment.

In addition, viewing the summary judgment evidence and the inferences therefrom in the light most favorable to Ultraview, I find at least two genuine issues of fact exist that also preclude entry of summary judgment.  The first is whether, under the circumstances of this case, Ultraview is a person who either "obtain[ed] money, merchandise, property, or other thing of value" by means of making Check #22004 or made payment "of [an] obligation" by this check as necessary to trigger liability under the statute.  It is undisputed that Check #22004 was not written to pay any obligation Ultraview had to EchoStar, but rather was made on Prime's behalf. It is also not clear from the record whether Ultraview received commissions or anything else of value as a result of its payment for this particular set of equipment for Prime.  As a result, EchoStar has not established that, under the undisputed facts, Ultraview is within the statutory definition of check writers that may be liable for treble damages under the statute.

Again viewing the evidence in the light most favorable to Ultraview, there is also a genuine issue whether Ultraview's account had sufficient funds to cover the check when it was made.  Under Colorado law, a check is "made" for purposes of the bad check statute when the check was "written."  *See Suncor Energy (USA), Inc. v. Aspen Petroleum Products, Inc.*, 178 P.3d 1263, 1267 (Colo. Ct. App. 2007).  Although the evidence in this case is that Check #22004 was printed on July 1, before the July 2 deposits sufficient to cover the check were made, the evidence does not show that the check was signed on this date or whether this

occurred on July 2, when sufficient funds were present to cover the check.  Accordingly, a genuine issue exists on this issue as well.

      D.      Fraud and Civil Conspiracy Claims

EchoStar alleges Wickline and Ultraview defrauded it by making false representations and/or fraudulently concealing material facts.

In order for summary judgment to enter against either Wickline or Ultraview on the basis of a false representation, EchoStar must demonstrate the absence of a genuine issue of fact for each of the following elements:  (1) the defendant made a false representation of a past or present fact; (2) the fact was material; (3) at the time the representation was made, the defendant knew it was false or was aware he did not know whether the representation was true or false; (4) the defendant made the representation with the intent that EchoStar would rely on the representation; (5) EchoStar relied on the false representation; (6) EchoStar's reliance was justified; and (7) EchoStar suffered damages as a result of this reliance.  *See Southeastern Colo. Water Conservancy Dist. v. Cache Creek Mining Trust*, 854 P.2d 167, 172 (Colo. 1993); *Knight v. Cantrell*, 390 P.2d 948, 951 (Colo. 1964); CJI-Civ. 19:1 (2008).

Similarly, to prevail on a fraud claim premised on fraudulent concealment, EchoStar must demonstrate that Wickline and/or Ultraview (1) concealed a past or present material fact (2) with the intent of creating a false impression of the actual facts in EchoStar's mind and that EchoStar (3) justifiably relied on the false impression that was created and (4) was damaged as a result.  *See Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1361 (Colo. 1993); *Wisehart v. Zions Bancorporation*, 49 P.3d 1200, 1204 (Colo. Ct. App. 2002); CJI-Civ. 19:2 (2008).  EchoStar must also show that Wickline and/or Ultraview had a duty to disclose information, which is a

26

question of law.  *See Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998); CJI-Civ. 19:2, Note 5 (2008).

Under Colorado law, a representation is false if it creates an untrue or misleading impression in the mind of another.  *See Meredith v. Ramsdell*, 384 P.2d 941, 944 (Colo. 1963); CJI-Civ. 19:3 (2008).  A fact is material if a reasonable person under the circumstances would regard it as important in deciding what to do.  *See Wade v. Olinger Life Ins. Co.*, 560 P.2d 446, 452 n.7 (Colo. 1977); CJI-Civ. 19:4 (2008).

According to its motion,[17] EchoStar's claim is based on three alleged misrepresentations or material omissions by Wickline and/or Ultraview.  First, it alleges that Wickline "falsely represented his role with Prime Satellite, by not disclosing his material interest to take advantage of EchoStar's Bounty Program."  Pls.' Mot. for Summ. J. (Doc. 57) at 48.  Next, it asserts fraud was committed when Wickline and/or Ultraview represented to EchoStar that Ultraview "was authorized to order and install equipment on behalf of Prime Satellite."  *Id.* at 49.  Finally, EchoStar asserts Wickline and Ultraview made false representations when they failed to inform EchoStar of the "convoluted relationship" between Ultraview and Prime, including that Wickline and/or Ultraview had "complete control over Prime Satellite."  *Id.* at 48-49.  EchoStar alleges it was harmed by these allegedly false and material misrepresentations because it led it "to conduct business with [Wickline and Ultraview] under the guise of Prime Satellite."  *Id.* at 49.

---

[17]     EchoStar only pled conclusory generalities regarding this claim in its complaint, thus failing to identify "the time, place, and contents of the false representations, the identity of the party making the false statements and the consequences thereof" as required by Federal Rule of Civil Procedure 9(b) and the Tenth Circuit.  *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

EchoStar's motion for summary judgment on its fraud claim on these bases fails at every level. To start, the undisputed evidence contradicts EchoStar's unsupported assertion that Ultraview falsely represented its authority to act on Prime's behalf. The ICA between Ultraview and Bush and these parties' dealings demonstrate that Ultraview was, in fact, authorized to order and install equipment on behalf of Prime.

With respect to the allegedly fraudulent failures to disclose, EchoStar has not addressed the legal question of whether Wickline and/or Ultraview had a duty to disclose the subject information to EchoStar. Nor has EchoStar provided evidence or even argument as to what false impression Wickline and Ultraview were trying to create when they did not inform EchoStar of the details of their relationship with Prime or that Wickline or Ultraview might share in the benefits of EchoStar's Bounty Program through this relationship. EchoStar also has not presented evidence that Wickline or Ultraview intended to mislead EchoStar by not disclosing more information about their contractual relationship with Bush/Prime, that this additional information would have been in any way material to EchoStar's dealings with Prime or that EchoStar would have acted differently if it had known either of these facts. Even if EchoStar had presented sufficient evidence to support its fraud claim, Wickline and Ultraview have presented evidence that, at minimum, creates genuine issues of material fact regarding multiple elements of this claim. As a result, EchoStar is not entitled to summary judgment on its fraud claim.

A claim for civil conspiracy is a derivative cause of action. *Double Oak Const., LLC v. Cornerstone Dev. Int'l, LLC*, 97 P.3d 140, 146 (Colo. Ct. App. 2003). If the acts constituting the underlying wrong do not provide the basis for an independent cause of action, therefore, there is

no cause of action for the conspiracy itself.  *Id.*  Here, the underlying wrong is the alleged fraud Wickline and Bush committed against EchoStar.  Because EchoStar is not entitled to summary judgment on its fraud claim against Wickline or Ultraview, its request for summary judgment on the related civil conspiracy claim also fails.  Even if this were not the case, EchoStar's account of the "undisputed" facts and the evidence cited in support of these facts is so garbled and incomplete that it has failed to carry its burden on other elements of this claim as well.[18] EchoStar's motion for summary judgment on its civil conspiracy claim is, therefore, denied.

     E.     Unjust Enrichment

     To prevail on its claim for unjust enrichment against Wickline and Ultraview on summary judgment, EchoStar must show that under the undisputed facts: (1) it conferred a benefit on one or both of these defendants; (2) Wickline and/or Ultraview appreciated or realized the benefit; and (3) Wickline and/or Ultraview accepted the benefit under such circumstances that it would be inequitable for one or both of them to retain the benefit without payment of its value.  *See Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093, 1096-97 (Colo. 1982).

     In support of this claim, EchoStar presents evidence regarding two events or circumstances: Ultraview's return of equipment to EchoStar on July 9, after Bush disappeared without explanation, and Ultraview's lack of responsibility under its Independent Contractor

---

[18]     The elements EchoStar must prove to prevail on its civil conspiracy claim are that:  (1) Wickline and Bush agreed, by words or by conduct, to defraud EchoStar; (2) one or more unlawful acts were performed to accomplish this goal; (3) EchoStar was damaged; and (4) EchoStar's damages were caused by the acts performed to accomplish Wickline and Bush's goal of defrauding EchoStar.  *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989); CJI-Civ. 27:1 (2008).

Agreement with Bush for chargebacks due from Prime to EchoStar under the Prime-EchoStar Retailer Agreement.

The first circumstance does not support an unjust enrichment claim, as no benefit was conferred from EchoStar to Ultraview by virtue of Ultraview returning equipment to EchoStar. As for the second circumstance, it is questionable whether EchoStar can be said to have conferred a benefit on Ultraview simply because Ultraview's separate bargain with Bush/Prime did not require Ultraview to pay chargebacks, or other contract charges, to EchoStar.  Even if this can be construed as a benefit under an unjust enrichment theory, there is no question that reasonable minds could differ on whether it would be inequitable for Ultraview to have benefitted from its installation of EchoStar receivers through its contractual relationship with Bush/Prime without also being liable to EchoStar for Prime's chargeback or other obligations under the Prime-EchoStar Retailer Agreement.

To the extent EchoStar is asserting that the whole of the Ultraview-Prime-EchoStar relationship resulted in an unjust enrichment to Ultraview, EchoStar's request for summary judgment also fails.  The present record does not show, as an undisputed matter or otherwise, that Ultraview received a net benefit from its involvement with Prime and the Prime-EchoStar Retailer Agreement.  Nor do the undisputed facts prove it would inequitable for Ultraview to retain whatever benefit it might have received from its involvement with EchoStar through Prime.  Even if EchoStar had carried its initial burden on both of these issues, there is evidence in the record from which a reasonable jury could conclude that Ultraview was not unjustly enriched at EchoStar's expense.

F.      Conversion

Under Colorado law, a claim for conversion exists for a "distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 884 (Kirshbaum, J. specially concurring) (quoting *Byron v. York Inv. Co.*, 296 P.2d 742, 745 (Colo. 1956)). "'The gist of the tort is the exercise, or intent to exercise, dominion or control over the property of another in denial of, or inconsistent with, his or her rights therein.'" *Id.* (quoting 7 Stuart M. Speiser et al., The American Law of Torts § 24:1 at 700 (1983)).

Whether EchoStar has stated a claim for conversion under Colorado law cannot be determined on the present record. EchoStar asserts the claim based on Ultraview having ordered, installed and received commissions for EchoStar satellite equipment "while refusing to pay EchoStar amounts owed for the equipment." Pls.' Mot. for Summ. J. (Doc. 57) at 48. EchoStar does not allege or present evidence, however, that it currently has a possessory interest in the equipment it delivered to Prime or Ultraview pursuant to its Retailer Agreement with Prime. The right to possess this equipment could currently reside in EchoStar, Prime, Ultraview or the subscriber for whom the equipment was installed. Without proof that it has the right to possess this equipment, EchoStar cannot prevail on its conversion claim on this basis.[19]

EchoStar also apparently asserts Ultraview converted commission payments EchoStar made to Prime because Ultraview has not paid commission chargebacks. Even assuming the commissions are personal property for which a conversion claim can be asserted, EchoStar has

---

[19]     In addition, although EchoStar alleges it was not paid for the satellite equipment it delivered to Prime and/or Ultraview, it is not clear on the present record, let alone undisputed, that this is true.

not demonstrated it has a possessory interest in these commissions, as they were paid to Prime

pursuant to Prime's Retailer Agreement with EchoStar.  Neither has EchoStar shown that

whatever right it has to recover "chargebacks" from Prime, under a conversion theory or

otherwise, renders Ultraview liable for these chargebacks simply because Prime may have paid

some of its obligations to Ultraview using money EchoStar paid it as commissions pursuant to

the Prime-EchoStar Retailer Agreement.

### Conclusion

For the reasons stated above, EchoStar's Motion for Summary Judgment (Doc. 57) is

denied.

IT IS SO ORDERED this 15th day of April, 2009.

s/John L. Kane_____
John L. Kane, Senior District Judge
United States District Court